UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DANA HATCH,<br><br>  Plaintiff,<br><br>  v.<br><br>SUNBELT RENTALS, INC.,<br><br>  Defendant. | Civil Action No. |

**COMPLAINT**
**JURY TRIAL REQUESTED**
**<u>INJUNCTIVE RELIEF REQUESTED</u>**

NOW COMES the Plaintiff, Dana Hatch ("Hatch"), by and through undersigned counsel, and complains against the Defendant, Sunbelt Rentals, Inc. ("Sunbelt"), as follows:

INTRODUCTION

1. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

2. Sunbelt violated Hatch's rights under the MHRA and the ADA by failing to accommodate his disability, terminating his employment because of his disability and because of Hatch's request and need for reasonable accommodations.

PARTIES

3. Hatch is a United States citizen residing in Buxton, Maine.

4. Sunbelt is a North Carolina corporation that is registered to do business in Maine.

JURISDICTION

5. Sunbelt is an equipment rental company with more than 500 locations in North America including two in Maine.

1

6. Sunbelt had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as or in the year prior to when the alleged discrimination occurred.

7. Sunbelt had more than 500 employees in each of 20 or more calendar weeks in the current or preceding year.

8. This Court has subject matter jurisdiction over Sunbelt's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

9. On June 24, 2015, Hatch filed a timely Charge of Discrimination against Sunbelt alleging unlawful disability discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

10. On or about May 24, 2016, the MHRC issued a Notice of Right to Sue with respect to Hatch's state law claims.

11. On or about May 18, 2016, the EEOC issued a Notice of Right to Sue with respect to Hatch's federal law claims.

12. Hatch has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

## FACTUAL ALLEGATIONS

13. Hatch was hired by NationsRent Companies, Inc. ("NationsRent") as a mechanic at its location in Scarborough, Maine on March 31, 2004.

14. In or around October 2005, NationsRent merged with Sunbelt and Sunbelt assumed control of its personnel processes. The Articles of Merger for the transaction were finalized in December 2006 and became effective on January 1, 2007.

15. Hatch continued to work at the Scarborough location for Sunbelt.

16. John Brown was the Scarborough location Manager at the time Hatch was hired and remained in that position until February 2015 when Brown transferred to a Sunbelt shop in Florida.

17. Raoul Carr was Manager of the Scarborough location from February 2015 until Hatch was terminated. Hatch never worked under Carr's supervision because Hatch was on a medical leave of absence when Carr took over as manager.

18. Hatch was qualified for his job as mechanic.

19. Hatch performed his duties well.

20. In 11 years of employment Hatch never had a bad review or any disciplinary action.

21. Hatch made $20.28 per hour when he was hired and he received steady pay increases based on merit.

22. At the time of Hatch's termination, his pay rate was $26.84 per hour and he worked full time (40 hours per week) plus overtime.

23. On October 27, 2014, Hatch tripped on a hole and landed with his arms outstretched. He felt a pop and pain in his left shoulder. The accident occurred at Hatch's home. Hatch had some movement in his left shoulder but could not internally rotate the humerus. Hatch could not use his left arm and kept it in a sling

24. A day or two after the accident, Hatch had sharp and aching pain in his left shoulder radiating into his left arm. There was swelling and clicking in the shoulder and decreased range of motion and pain in his arm.

25. On about October 31, 2014, Hatch asked Sunbelt for a medical leave of absence for his left shoulder impairment.

26. Hatch called and left a message for Benefits Specialist Kimberly Sylvester about his request. Sylvester did not return Hatch's call.

27. Sylvester did, however, grant Hatch a protected leave of absence through January 19, 2015 under the Maine Family and Medical Requirements Act and/or the federal Family Medical Leave Act.

28. In November 2014, Hatch's orthopedic surgeon, Bryce Wolf, MD, diagnosed him with acute subscapularis tendon rupture with tenodesis. (He tore the subscapular muscle off his shoulder and dislocated the biceps.)

29. On November 11, 2014, Dr. Wolf prepared a statement for Sunbelt indicating that Hatch was unable to work and that he was awaiting the results of medical tests before estimating when Hatch would be able to return. The statement was faxed to Sunbelt on December 10, 2014.

30. On December 16, 2014, Hatch had surgery on his left should to repair the complete rupture of his rotator cuff.

31. As of December 2014, Hatch knew that his shoulder impairment would prevent him from working for more than six months, from October 27, 2014 until about June 16, 2015.

32. Sunbelt also knew that Hatch's impairment was expected to prevent him from working from October 27, 2014 until June 16, 2015 because it received a Sunbelt Leave Request Form on December 8, 2014, signed by Hatch, requesting leave until June 16 2014.

33. Hatch's request was based on his understanding of the amount of time Dr. Wolf thought it would take for Hatch to regain the functional use of his shoulder.

34. Between October 28 and December 8, 2014, Hatch was using up his accrued vacation time and was not on an unpaid medical leave.

35. Between October 28 and December 8, 2014, prior to surgery, Hatch tried to get modified duty from his direct supervisor, Mr. Brown. Sunbelt refused to make light or modified duty work available to Hatch.

36. Following surgery, Hatch's treatment included physical therapy starting with stretching and range of motion exercises.

37. Sunbelt did not deny Hatch's request for leave through June 16, 2015, which he submitted on December 8, 2014.

38. Sunbelt did not terminate Hatch's employment when he did not return to work at the end of the leave of absence approved by Sunbelt through January 19, 2015.

39. Hatch had reason to believe that Sunbelt approved his request for a leave of absence through June 16, 2015.

40. Sunbelt's failure to deny Hatch's request for a leave of absence through June 16, 2015 and its failure to take any action when January 19, 2015 came and went amounts to a tacit approval by Sunbelt to Hatch's request for extended leave through June 16, 2015.

41. In March 2015, Hatch continued rehabilitation using strengthening exercises.

42. On March 11, 2015, Dr. Wolf estimated that Hatch would be able to return to work in one to two months.

43. On March 11, 2015, Dr. Wolf wrote in Hatch's medical records, "Continue rehab, begin strengthening exercises. Return in 1 month, possible return to work in 1-2 months. No work for now. . . ."

44. On March 25, 2015, Hatch received a letter from Sylvester that read, in part:

"This letter is to request a return to work status. It is important that you communicate your intention to return to work by 5:00pm on Monday, March 30, 2015. If I do not hear from you by this deadline, we will consider your inaction as

evidence that you want to resign from the company and we will process your separation accordingly."

45. Hatch knew that it was likely his doctor would release him for work at his next doctor's appointment on April 10, 2015.

46. Hatch called Sylvester to talk about getting an extension of the March 30, 2015 deadline. Hatch left a message but Sylvester did not return his call.

47. Hatch also sent an email to Sylvester on March 25, 2015 at 6:00 PM that read:

"I received the Leave update papers in the mail today. The due date is Monday, 3/30, that's 3 business [days] to complete my portion and get my doctor to complete his portion. My next appointment with him is not until April 10th.

"…I need to see my doctor before I can give you a status on when I can return to work. I left a message for my doctor. Once I hear back from him I will complete the forms and get them to you ASAP.

"If there is an issue with the timing of this, please let me know as soon as possible so I can deal with it another way.

"Thank you very much."

48. Sylvester received Hatch's email but did not respond by email or call to discuss Hatch's request.

49. On April 3, 2015, Hatch sent an email to Sunbelt District Manager Diana Kelleher, alerting her to a problem that he was having with his left knee.

50. Kelleher already knew that Hatch had knee problems because he had his right knee replaced in 2011.

51. Hatch did not request to extend his medical leave of absence in connection with his knee problem. Hatch was just giving Ms. Kelleher a heads up so that she would not be surprised to learn that Dana's left knee was getting worse.

6

52. Neither Kelleher nor Sylvester called or emailed Hatch to discuss his return to work or his left knee problem.

53. Kelleher forwarded Hatch's email about his knee problems to Territory Human Resources Manager AnnMarie Rice.

54. On April 6, 2015, Rice wrote an email to Sylvester directing her to tell Hatch that he had been "out for 6 months and due to business needs (we are in our busy season) we would like to notify him that we can no longer hold his position."

55. As directed by Rice, Sylvester wrote to Hatch on April 9, 2015, terminating his employment effective immediately:

> "Due to the length of leave, Sunbelt can no longer hold your position. Under the circumstance, I am sending this to serve as notification that your employment at Sunbelt has been terminated as of April 9, 2015. . . . Although we regret that we could not continue to hold your position indefinitely, we value the service you have provided and sincerely hope that you will consider reapplying once your circumstances allow you to do so…"

56. No one from Sunbelt – not Sylvester, Rice, or Kelleher – bothered to communicate directly with Hatch in response to his phone calls and emails before deciding to terminate, and terminating, his employment.

57. One day later, on April 10, 2015, Dr. Wolf judged that Hatch's left shoulder was improved well enough to release Hatch to return to work as a mechanic.

58. When Hatch saw his doctor on April 10, 2015 and was released to return to work, Hatch did not know that Sylvester had already sent him a letter terminating his employment with Sunbelt effective April 9, 2015.

59. Hatch received the termination letter in the mail right after returning from his doctor's appointment.

7

60. Hatch was upset and disappointed that he was treated with such disregard after 11 years of service.

61. Hatch knew the people involved in his termination for a long time and was dismayed that they did not have the decency to call and tell him what was happening.

62. Hatch was distressed that they simply assumed that he was too disabled to work and ended his employment.

63. Sunbelt terminated Hatch's employment just one day before he was released to return to work as a mechanic.

64. Even if Sunbelt was entering its busy season, it could not have posed any hardship on Sunbelt to hold Hatch's job for one more day.

65. Sunbelt did not hire another mechanic until July 13, 2015, three months after Hatch was ready to return to work.

66. Hatch became disabled on about October 27, 2014 when he seriously injured his left shoulder in an accident at home. Hatch tore the subscapular muscle off his shoulder and dislocated the biceps. Without treatment including surgery and rehabilitation, Hatch would be substantially limited in the major life activities of lifting, performing manual tasks and working. Hatch's shoulder impairment substantially impaired his physical health. Hatch's shoulder impairment substantially impaired his physical health and lasted more than six months. Sunbelt knew that Hatch had a serious shoulder impairment and regarded him as having such an impairment. Hatch was disabled as defined in the MHRA, 5 M.R.S. § 4553- A and the ADA, 42 U.S.C. § 12102.

67. Sunbelt's actions in this case violated the MHRA including but are not limited to the following provisions: 5 M.R.S. § 4572(1)(A)(which prohibits discrimination and makes it

unlawful to terminate an employee because of a physical disability);  5 M.R.S. § 4572(2)(which prohibits discrimination against qualified individuals with disabilities); 5 M.R.S. §§ 4553(2)(E) and 4572(2)(which define unlawful discrimination to include not making reasonable accommodations to the known physical limitations of an employee who is an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the employer's business);  5 M.R.S. § 4553(10)(D)(which defines unlawful discrimination to include punishing or penalizing any person for seeking to exercise any of the civil rights declared by the MHRA); and various MHRC's regulations including, 94-348 C.M.R Ch. 3, §2(17)(c) which provides that to determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the individual with a disability in need of the accommodation to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

68. Sunbelt's actions in this case violate the ADA including but are not limited to the following provisions: 42 U.S.C. § 12112(a)(which prohibits disability discrimination including termination); 42 U.S.C. § 12112(5)(A)(which makes it unlawful not to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity); 42 U.S.C. §  12203(a)(which makes it unlawful to discriminate against any individual because such individual has opposed any act or practice made unlawful by the ADA); and various regulations including 29 C.F.R. § 1630.2(o)(3) (informal, interactive process).

69. Sunbelt denied Hatch's requests for the reasonable accommodation of a medical leave of absence through April 10, 2015.

70. Sunbelt denied Hatch's request for the reasonable accommodation of an extension of time, from March 30 to April 10, 2015, to provide paperwork requested by Sunbelt regarding Hatch's return to work status.

71. Sunbelt failed to initiate an informal, interactive process with Hatch to determine how much more time off he needed, if any, for his shoulder or knee impairment.

72. Sunbelt terminated Hatch because of his disability (shoulder).

73. Sunbelt terminated Hatch because Hatch was thought to have another disability involving his knee.

74. Sunbelt terminated Hatch because he requested and needed reasonable accommodations.

75. Sunbelt terminated Hatch's employment on April 9, 2015, just one day short of the end of Hatch's medical leave.

## COUNT I: MHRA – Disability Discrimination

76. Paragraphs 1-75 are incorporated by reference.

77. Defendant's conduct violates the MHRA's prohibitions against disability discrimination including prohibitions on retaliation for engaging in activity protected by the MHRA.

## COUNT II: MHRA – Reasonable Accommodation

78. Paragraphs 1-77 are incorporated by reference.

79. Defendant's conduct violates the MHRA's requirement that employers provide reasonable accommodations to qualified individuals with disabilities.

80. Defendant's conduct violated the MHRA's regulation requiring employers to initiate an informal, interactive process to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

## COUNT III: ADA – Disability Discrimination

81. Paragraphs 1-80 are incorporated by reference.

82. Defendant's conduct violates the ADA's prohibitions against disability discrimination including prohibitions on retaliation for engaging in activity protected by the MHRA.

## COUNT IV: ADA – Reasonable Accommodation

83. Paragraphs 1-82are incorporated by reference.

84. Defendant's conduct violated the ADA's requirement that employers provide reasonable accommodations to qualified individuals with disabilities.

85. Defendant's conduct violated the EEOC's regulation requiring employers to initiate an informal, interactive process to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of his rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

  E. Award equitable-relief for back pay, benefits and prejudgment interest;

  F. Award compensatory damages in an amount to be determined at trial;

  G. Award punitive damages in an amount to be determined at trial;

  H. Award liquidated damages in an amount to be determined at trial;

  I. Award nominal damages;

  J. Award attorney's fees, including legal expenses, and costs;

  K. Award prejudgment interest;

  L. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

  M. Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

  N. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

  O. Require that Defendant train all management level employees on the protections afforded by the MHRA and the ADA;

  P. Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of disability; and

  Q. Grant to Plaintiff such other and further relief as may be just and proper.


Dated: May 26, 2016          */s/* Chad T. Hansen
                   chansen@maineemployeerights.com

                   */s/* Peter Thompson
                   pthompson@maineemployeerights.com

                   Attorneys for the Plaintiff
                   MAINE EMPLOYEE RIGHTS GROUP

                92 Exchange Street 2nd floor
                Portland, Maine 04101
                Tel. (207) 874-0905